## COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, ss.**

**SUPERIOR COURT**
**DOCKET NO:** 2582CV01159

|  |  |
|---|---|
| JANICE ALLEN BROOKS,<br>Plaintiff,<br><br>v.<br><br>THE PARK SCHOOL and<br>SCOTT YOUNG, individually and as<br>Head of School,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

## INTRODUCTION

This case concerns the systematic denial of legally mandated accommodations to a dedicated educator with disabilities, culminating in her wrongful termination after 33 years of distinguished service. Plaintiff Janice Allen-Brooks was a beloved and accomplished music teacher at The Park School who taught history and cultural awareness through music, prepared students for performances at venues including the White House, and facilitated meetings between her students and luminaries such as Nelson Mandela and Rosa Parks. Despite her exemplary record, when Mrs. Allen-Brooks returned to in-person teaching following the pandemic with legally protected disabilities—legal blindness due to glaucoma and a compromised immune system due to immunosuppressive medications—Defendants systematically failed to provide the reasonable accommodations they had promised, subjected her to dangerous working conditions, assigned her an manifestly unqualified and unstable assistant despite her repeated warnings, and ultimately forced her out of her position when she

refused to resign or retire.

Rather than honor their legal and moral obligations to accommodate a disabled employee, Defendants engaged in a calculated pattern of discrimination and retaliation. They repeatedly pressured Mrs. Allen-Brooks to accept early retirement packages even after she had signed her contract and expressed her eagerness to return to in-person teaching. When she refused to resign, Defendants created increasingly untenable and dangerous working conditions by denying her the accommodations necessary to safely perform her duties. After Mrs. Allen-Brooks complained about the unqualified assistant who posed a danger to her students, Defendants locked her out of school systems and falsely claimed she had "voluntarily resigned" after she took previously-approved personal leave—despite the fact that she never signed any resignation, retirement, or separation papers. The Massachusetts Department of Unemployment Assistance investigated and determined that Mrs. Allen-Brooks was discharged after she refused to accept a paid leave of absence or resign, explicitly finding no misconduct on her part.

This complaint seeks redress for Defendants' violations of state and federal disability discrimination laws, their failure to provide reasonable accommodations, their retaliation against Mrs. Allen-Brooks for asserting her legal rights, and their wrongful termination of a dedicated teacher who simply asked to be allowed to do her job safely.

## PARTIES

1. Plaintiff Janice Allen-Brooks is an individual residing in the Commonwealth of Massachusetts.

2. Defendant The Park School ("the School") is a private educational institution located in Norfolk County, Massachusetts, and was Plaintiff's employer during all times relevant to this action.

2

3.     Defendant Scott Young is an individual who served as Head of School at The Park School during all times relevant to this action and acted within the scope of his employment and with apparent authority on behalf of the School.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this matter pursuant to Mass. Gen. Laws ch. 151B and supplemental jurisdiction over related state law claims.

5.     Venue is proper in Norfolk County Superior Court because the events giving rise to this action occurred in Norfolk County, Massachusetts.

6.     Plaintiff has exhausted all administrative remedies required under Mass. Gen. Laws ch. 151B by filing charges with the Massachusetts Commission Against Discrimination ("MCAD"), which investigated and issued its determination.

## FACTUAL ALLEGATIONS

**Plaintiff's Employment and Disabilities**

7.     Plaintiff was hired by The Park School in 1989 to teach music.

8.     For 33 years, Plaintiff taught students history and cultural awareness through music and prepared children and adults for music events both at the School and at outside venues.

9.     Plaintiff's accomplishments included preparing students for performances at The White House for President and Mrs. Obama and their guest, arranging for performances for Nelson Mandela at the Esplanade during his historic visit to the United States, and facilitating opportunities for her students to meet and converse with civil rights icon Rosa Parks.

10.     Plaintiff suffers from legal blindness due to glaucoma, a condition that significantly limits her major life activity of seeing.

11.     Plaintiff also has a compromised immune system as a result of taking immunosuppressive

medications following kidney transplant surgery.

12.     Both conditions constitute disabilities within the meaning of Mass. Gen. Laws ch. 151B and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

13.     Despite her disabilities, Plaintiff was able to perform the essential functions of her position as a music teacher with reasonable accommodations.

**Defendant Young's Knowledge of Plaintiff's Disabilities and Failures to Accommodate**

14.     When Scott Young became Head of School in 2018, he was made aware of Plaintiff's health situation through direct communication with Plaintiff, the head of the music department, letters from Plaintiff's physicians, and school records.

15.     Plaintiff requested a reasonable accommodation: an adjustment of the lighting in her classroom, which was too bright and flickered, and in the corridor where the music department office was located, which was dimly lit or often turned off.

16.     Defendant Young ignored this request.

17.     As a direct result of inadequate lighting, Plaintiff tripped on a rug in her classroom and broke her wrist in December 2018.

18.     In February 2019, due to the dimly lit hallway outside the music office, Plaintiff tripped over the legs of a child sitting on the floor and broke her patella (right kneecap).

19.     In both incidents, Plaintiff returned to work the following day, demonstrating her extraordinary dedication to her students and the School.

**The Pandemic and Plaintiff's Contract for the 2022-2023 School Year**

20.     After teaching remotely for 23 months during the pandemic, Plaintiff looked forward to returning to in-person teaching.

21.     On December 14, 2021, Plaintiff reached out to Defendant Young expressing her desire

4

to return to in-person instruction. Defendant Young had already asked Plaintiff to come to "Winterfest" to lead the school in song.

22.     On March 4, 2022, Plaintiff received her contract to teach full-time in-person beginning in September 2022.

23.     Plaintiff signed the contract and returned it on the same day she received it.

24.     From April 2022 through June 2022, at Defendant Young's request, Plaintiff came to the School weekly to prepare the upper grade chorus for their Spring Concert and Graduation.

**The Accommodation Meeting and Broken Promises**

25.     At the beginning of June 2022, Defendant Young arranged a meeting with Plaintiff, Plaintiff's husband Robert, and the School's Human Resources representative to discuss supporting Plaintiff's needs in preparation for her return to in-person teaching.

26.     At this meeting, the parties discussed reasonable accommodations, and Defendant Young provided ADA forms for Plaintiff and her physician to complete and sign.

27.     The following accommodations were discussed and agreed upon:

> a. A plan to support Plaintiff's monthly infusion treatments, which occur on Tuesdays;
>
> b. Students would wear masks when in Plaintiff's classroom to protect her compromised immune system;
>
> c. The School would place two HEPA air filters in Plaintiff's classroom;
>
> d. The School would hire a qualified assistant to support Plaintiff while teaching;
>
> e. The School would provide IT training in the classroom before the start of school;
>
> g. The School would remove all fall hazards in and around Plaintiff's classroom,

5

including rugs, and would not permit students to sit on the floor outside her classroom.

28. Defendant Young stated that if they had missed anything, Plaintiff should bring it to his attention and he would make adjustments throughout the year.

29. Toward the end of this June 2022 meeting—after the parties had already discussed Plaintiff's accommodations for her September return—Defendant Young offered Plaintiff an "Early Retirement Package."

30. Plaintiff thanked Defendant Young but declined the offer, explaining that she was excited to return to in-person teaching, something she had expressed to him numerous times since December 14, 2021.

31. Defendant Young continued to offer Plaintiff retirement agreements repeatedly via email and in person, to the point of harassment, despite the fact that Plaintiff had signed her contract on March 4, 2022.

32. Plaintiff declined every retirement offer.

**Defendants' Systematic Failure to Provide Accommodations**

33. Not one of the agreed-upon accommodations was properly implemented when Plaintiff returned to work in September 2022.

34. On the first day teachers returned to the building (approximately one week before students), Plaintiff discovered the building was in full construction mode.

35. Construction work was being performed in the first-floor corridor and cafeteria where the music classrooms were housed, and in the basement directly outside the music office.

36. There were nails, hammers, drills, and sticky adhesive paper that literally pulled Plaintiff's sandals off her feet—a seriously dangerous situation for someone with low vision.

6

37.    No assistant had been hired for Plaintiff, so her retired husband helped her set up her classroom every day until students arrived. Defendant Young greeted Plaintiff's husband in the hallway each day as if he were a paid employee.

38.    When students arrived, Plaintiff still had no assistant. The School eventually sent her the "third grade team assistant" to help with a few classes for a few days.

39.    Every other grade level and department had an assistant assigned to it, but the Music Department did not.

40.    There was no plan in place to support Plaintiff's monthly infusion treatments. The School's scheduler, Matt Kessler, scheduled Plaintiff's chorus class at the exact time of her infusion appointment.

41.    Plaintiff was forced to change her medical schedule, which had been consistent for three years. The timing of this medication is critical and allows only a very small window.

42.    The children initially complied well with the masking requirement until Tina Fox, Head of Lower Division, gave them permission not to wear masks, thereby exposing Plaintiff's compromised immune system to increased risk of infection.

43.    Only one HEPA filter was placed in Plaintiff's classroom, not the two that had been promised.

44.    Plaintiff did not receive IT training before or after school started. When Plaintiff repeatedly asked IT coordinator Carole Carter to help her set up her music technology so she would be prepared for the first day of school, Ms. Carter did not appear until the first day of school.

45.    Defendant Young unilaterally removed Plaintiff's most beloved class—Pre-K, which she had taught for 32 years—without discussing alternative accommodations with her. For 32 years,

Date Filed 10/17/2025 2:57 PM
Superior Court - Norfolk
Docket Number

Plaintiff had taught more classes than any other teacher in the School, and no one had ever offered to lighten her workload before.

**Additional Unmet Accommodation Needs**

46. On the first day of school for students, Plaintiff's husband drove her to the front of the School to assist her to her classroom, as had been their routine for many years before the pandemic.

47. Defendant Young approached them and informed them that the four handicapped parking spaces that had previously been in front of the School were no longer there; those spaces had been redesignated for school buses, meaning that on most days there would be no space available for drop-off.

48. This change meant that anyone with a disability who worked at the School—whether employees, students, or caretakers—could no longer stop at the front entrance to receive assistance or park.

49. When Plaintiff requested an accommodation for this situation, Defendant Young stated there would be no changes. Handicapped parking was now located a considerable distance from the front entrance.

50. The School's theater, which Plaintiff used frequently for teaching, practice, and performances, had steep stairs leading down to the stage with no railings.

51. Plaintiff had no safe means of accessing the stage due to her visual impairment. Over the years, multiple people had fallen down those theater stairs, including a math teacher, Steve Kellogg, who broke his neck in such a fall.

52. Plaintiff brought this safety concern to the attention of Defendant Young and other administrators, but her pleas for assistance were ignored.

53. During theater rehearsals, Plaintiff was forced to send students down the stairs with her assistant while she conducted from the top of the auditorium. On performance days, she had to arrive early and position herself before the audience arrived, then remain in place until the theater cleared.

54. The School provided Plaintiff with no fire drill evacuation route or shelter-in-place plan adapted to her visual disability.

55. After the first practice drill during the first week of school, Plaintiff brought this serious safety concern to Defendant Young's attention. He stated he would arrange a meeting to address it, but no such meeting ever occurred.

56. During the fire drill, Plaintiff's husband had to lead the way as over 600 people attempted to exit the building simultaneously. Without his assistance, Plaintiff would have been unable to navigate safely.

**The Unqualified and Dangerous Assistant**

57. During the summer of 2022, Defendant Young and Tina Fox interrupted Plaintiff's summer break to ask her to assist in interviewing Mr. Innocent Okechukue for the position of Plaintiff's teaching assistant.

58. At that time, the head of the music department had abruptly resigned, along with two other music teachers, leaving only three music teachers for the upcoming school year.

59. After reviewing Mr. Okechukue's resume and interviewing him, Plaintiff told Defendant Young and Ms. Fox that they should vet him more thoroughly because there were too many inconsistencies in his background and no reliable references to contact.

60. Plaintiff does not know whether Defendants conducted additional vetting, but Defendant Young hired Mr. Okechukue during the second week of school. Plaintiff learned he had been

9

hired when another music teacher, Amanda Mahei, dropped him off at Plaintiff's classroom door without advance notice.

61.    After approximately one week of working with Mr. Okechukue, serious problems became apparent.

62.    Mr. Okechukue informed Plaintiff that he had recently been diagnosed with severe depression and severe anxiety.

63.    Mr. Okechukue suffered from chronic urinary tract infections that caused him to run out of Plaintiff's classroom periodically during class time.

64.    Mr. Okechukue experienced unpredictable anxiety attacks during class and exhibited significant mood swings.

65.    Mr. Okechukue had difficulty wearing a mask—one of the accommodations specifically designed to protect Plaintiff's compromised immune system—because he needed air during his anxiety attacks.

66.    All of these issues disqualified Mr. Okechukue from serving as an effective assistant for a visually impaired teacher responsible for young children.

67.    On one occasion when Plaintiff took her first-grade class into the theater, she asked Mr. Okechukue to escort the children down to the stage while she conducted from the top of the theater due to her inability to safely navigate the stairs.

68.    When class concluded and Plaintiff directed the children to return up the stairs, she discovered that Mr. Okechukue had passed out on the floor near the students.

69.    Mr. Okechukue told Plaintiff that when he has anxiety attacks, he sometimes loses consciousness and does not know where he is or how he got there when he regains consciousness.

70. Mr. Okechukue exhibited volatile behavior, including giving Plaintiff hostile looks when she asked him to perform simple tasks such as distributing drums to students, and sometimes doing what he wanted rather than following Plaintiff's instructions.

71. When students struggled to understand material, Mr. Okechukue would become impatient and raise his voice at them.

72. After Mr. Okechukue raised his voice at students, Plaintiff had to limit his contact with children and kept him at the piano, positioned away from the students.

73. Mr. Okechukue's unpredictable behavior made it extremely difficult for Plaintiff to perform her teaching duties effectively and safely.

74. Mr. Okechukue himself expressed fear about his own condition and stated that he did not enjoy teaching young children, referring to the choir students as "his nightmares."

**Plaintiff's Repeated Complaints and Defendants' Dismissive Response**

75. Plaintiff repeatedly reported her serious concerns about Mr. Okechukue to Defendant Young, Tina Fox, Ken Rogers, Olivia, and Kim B.

76. Plaintiff desperately pleaded for help because Mr. Okechukue's behavior was unpredictable and she had become frightened for her own safety and the safety of her students.

77. Defendant Young was dismissive of Plaintiff's concerns.

78. At one point, Defendant Young stated he would send administrators into Plaintiff's classroom to observe Mr. Okechukue, but no one ever came.

79. Due to Defendants' failure to address the dangerous situation, Plaintiff's husband began staying at school with her in hopes that administrators would eventually provide a solution.

80. A meeting was eventually convened with Ken Rogers, Tina Fox, David Cordes, Mr. Okechukue, and Plaintiff.

11

81. During this meeting, Ken Rogers twisted the narrative, reframing the situation from "administration made a bad hire" to "Janice and Innocent are fighting and don't like each other."

82. By this point, it had become obvious that Defendant Young and the administrative team were working in concert to discourage Plaintiff by retaliating against her through their refusal to provide the reasonable accommodations she needed to continue teaching safely.

**Plaintiff's Termination**

83. Plaintiff's final meeting with Defendant Young occurred on October 24, 2022.

84. Plaintiff told Defendant Young that having Mr. Okechukue in her classroom posed a risk and danger to the children and to herself, and that she did not need his "assistance" if this was what it was going to be.

85. Defendant Young insisted that Mr. Okechukue had been hired to assist Plaintiff and that was final.

86. Plaintiff responded that Mr. Okechukue was not qualified and had made it very difficult for her to do her job, and she asked Defendant Young to assign him a different position, as the School typically did with other employees who were not working out in their assigned roles.

87. Defendant Young stated that he would need to speak with Mr. Okechukue the following day, but in the meantime, he would send Plaintiff another retirement package.

88. Plaintiff had previously been approved to take personal leave on October 25, 2022.

89. On October 25, 2022, Plaintiff discovered she had been completely locked out of all Park School communications systems except the main switchboard.

90. Defendant Young had deactivated Plaintiff's key fob.

91. Defendant Young subsequently informed Plaintiff that she had "voluntarily resigned" during their meeting on October 24, 2022.

12

92.    Plaintiff had never signed any resignation paperwork, retirement agreement, or separation agreement.

93.    Plaintiff was shocked that Defendant Young falsely claimed she had resigned.

**Administrative Determinations**

94.    Following her termination, Plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC"), the Massachusetts Commission Against Discrimination ("MCAD"), and the Massachusetts Department of Unemployment Assistance ("DUA").

95.    The EEOC investigated Plaintiff's claims from April 2023 through December 2023, after which the case was transferred to MCAD.

96.    MCAD investigated and issued its determination, exhausting Plaintiff's administrative remedies and permitting this lawsuit.

97.    The DUA conducted its own investigation and determined that Plaintiff's discharge was not attributed to deliberate misconduct in willful disregard of the employing unit's interest.

98.    Based on all available facts, the DUA determined that the School discharged Plaintiff after she refused to accept a paid leave of absence or resign from her job.

99.    The DUA granted Plaintiff's unemployment claim in full, a process that took four months during which Plaintiff received no income.

**Damages**

100.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer significant damages, including:

   a. Lost wages and benefits from October 2022 through the present;

   b. Loss of future earning capacity and retirement benefits;

   c. Severe emotional distress, humiliation, and damage to her professional

reputation;

    d. Loss of the opportunity to continue her life's work teaching music to children;

    e. Physical manifestations of emotional distress; and

    f. Loss of enjoyment of life.

101.    Defendants' conduct was willful, wanton, and in reckless disregard of Plaintiff's rights, warranting an award of punitive damages.

## COUNT I

Discrimination on the Basis of Disability in Violation of Mass. Gen. Laws Chapter 151B

(Against All Defendants)

102.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 101 as if fully set forth herein.

103.    At all times relevant hereto, Plaintiff was an employee of Defendant The Park School within the meaning of M.G.L. c. 151B.

104.    At all times relevant hereto, Plaintiff suffered from disabilities within the meaning of M.G.L. c. 151B, including legal blindness due to glaucoma and a compromised immune system due to immunosuppressive medications following kidney transplant surgery.

105.    Defendants discriminated against Plaintiff on the basis of her disabilities by treating her differently than similarly situated employees without disabilities, including but not limited to subjecting her to a hostile work environment, refusing to provide reasonable accommodations, assigning her an unqualified and dangerous assistant while ignoring her repeated complaints, and ultimately terminating her employment.

106.    Defendants' conduct was intentional, willful, and in violation of M.G.L. c. 151B.

14

107. As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has suffered damages including lost wages, lost future wages and benefits, severe emotional distress, and other compensatory damages.

## COUNT II

### Failure to Provide Reasonable Accommodations in Violation of Mass. Gen. Laws Chapter 151B

### (Against All Defendants)

108. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 101 as if fully set forth herein.

109. Plaintiff requested reasonable accommodations from Defendants to enable her to perform the essential functions of her job, including:

        a. Appropriate lighting adjustments in her classroom and work areas;

        b. Accessible handicapped parking near the school entrance;

        c. Safe access to the theater auditorium stage;

        d. A qualified and stable teaching assistant;

        e. Masking requirements for students to protect her compromised immune system;

        f. Two HEPA air filters in her classroom;

        g. Scheduling accommodation for monthly medical infusion treatments;

        h. IT training before the school year began;

        i. Removal of fall hazards in and around her classroom;

        j. A safe evacuation route for fire drills and emergencies.

110. The requested accommodations were reasonable and would not have imposed an undue hardship on Defendants.

15

111. Defendants failed and refused to provide the reasonable accommodations requested and agreed upon with Plaintiff, despite their legal obligation to do so under M.G.L. c. 151B.

112. Defendants failed to engage in a good faith interactive process to determine appropriate accommodations for Plaintiff's disabilities.

113. Defendants' failure to provide reasonable accommodations was intentional, willful, and in violation of M.G.L. c. 151B.

114. As a direct and proximate result of Defendants' failure to accommodate, Plaintiff has suffered damages including lost wages, lost future wages and benefits, severe emotional distress, and other compensatory damages.

## COUNT III

### Retaliation in Violation of Massachusetts General Laws Chapter 151B

### (Against All Defendants)

115. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 101 as if fully set forth herein.

116. Plaintiff engaged in protected activity under M.G.L. c. 151B by requesting reasonable accommodations for her disabilities and complaining about discriminatory treatment and unsafe working conditions.

117. Following Plaintiff's requests for accommodations and her complaints about the unqualified assistant assigned to her, Defendants subjected her to adverse employment actions and retaliation, including but not limited to:

    a. Hostile and dismissive treatment by Defendant Young and other administrators;

    b. Continued assignment of a manifestly unqualified and dangerous assistant

despite Plaintiff's repeated warnings;

c. Refusal to observe the problematic assistant in the classroom as promised;

d. Repeated pressure to accept early retirement packages;

e. Deactivation of Plaintiff's building access and communication systems;

f. False characterization of Plaintiff's termination as a "voluntary resignation";

g. Ultimate termination of her employment.

118.    There was a causal connection between Plaintiff's protected activity and the adverse employment actions taken against her.

119.    Defendants' retaliatory conduct was motivated by Plaintiff's protected activity and was in violation of M.G.L. c. 151B.

120.    As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered damages including lost wages, lost future wages and benefits, severe emotional distress, and other compensatory damages.

## COUNT IV

Discrimination on the Basis of Disability in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

(Against All Defendants)

121.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 101 as if fully set forth herein.

122.    At all times relevant hereto, Defendants were employers within the meaning of the ADA, 42 U.S.C. § 12111(5).

123.    At all times relevant hereto, Plaintiff was a qualified individual with disabilities within

17

the meaning of the ADA.

124.    Plaintiff's disabilities—legal blindness due to glaucoma and compromised immune system due to immunosuppressive medications—substantially limited one or more major life activities, including seeing and immune function.

125.    Plaintiff was qualified to perform the essential functions of her position as a music teacher, with or without reasonable accommodation.

126.    Defendants discriminated against Plaintiff on the basis of her disabilities in violation of the ADA by failing to provide reasonable accommodations, subjecting her to unsafe working conditions, and taking adverse employment actions against her because of her disabilities.

127.    Defendants failed to engage in the interactive process required by the ADA to determine appropriate reasonable accommodations.

128.    As a direct and proximate result of Defendants' violations of the ADA, Plaintiff has suffered damages including lost wages, lost future wages and benefits, severe emotional distress, and other compensatory damages.

## COUNT V

Failure to Provide Reasonable Accommodations in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

(Against All Defendants)

129.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 101 as if fully set forth herein.

130.    Plaintiff requested reasonable accommodations that would have enabled her to perform the essential functions of her position as a music teacher.

18

131. The accommodations requested by Plaintiff were reasonable and would not have imposed an undue hardship on Defendants.

132. Defendants failed to engage in the good faith interactive process required by the ADA.

133. Defendants failed to provide reasonable accommodations in violation of the ADA.

134. As a direct and proximate result of Defendants' violations of the ADA, Plaintiff has suffered damages including lost wages, lost future wages and benefits, severe emotional distress, and other compensatory damages.

## COUNT VI

Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

(Against All Defendants)

135. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 101 as if fully set forth herein.

136. Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodations and opposing discriminatory practices.

137. Defendants subjected Plaintiff to adverse employment actions because of her protected activity, including termination of her employment.

138. There was a causal connection between Plaintiff's protected activity and the adverse employment actions.

139. As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered damages including lost wages, lost future wages and benefits, severe emotional distress, and other compensatory damages.

19

## COUNT VII

Wrongful Termination in Violation of Public Policy

(Against All Defendants)

140.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 101 as if fully set forth herein.

141.    Plaintiff's employment was terminated in violation of clearly established public policy protecting disabled employees from discrimination and guaranteeing their right to reasonable accommodations.

142.    Defendants terminated Plaintiff's employment because of her disabilities and in retaliation for her requests for reasonable accommodations and her complaints about unsafe working conditions.

143.    Plaintiff's termination violated the public policy of Massachusetts as expressed in M.G.L. c. 151B and federal law as expressed in the ADA.

144.    As a direct and proximate result of her wrongful termination, Plaintiff has suffered damages including lost wages, lost future wages and benefits, severe emotional distress, and other compensatory damages.

## COUNT VIII

Intentional Infliction of Emotional Distress

(Against All Defendants)

145.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 101 as if fully set forth herein.

146.    Defendants engaged in extreme and outrageous conduct toward Plaintiff, including but

20

not limited to:

a. Promising reasonable accommodations necessary for Plaintiff's safety and then systematically failing to provide them;

b. Deliberately exposing Plaintiff to dangerous working conditions, including active construction zones and fall hazards, knowing of her visual impairment;

c. Assigning Plaintiff a manifestly unqualified assistant who suffered from severe mental health issues, lost consciousness around children, and posed a danger to students, despite Plaintiff's repeated warnings and requests for a qualified assistant;

d. Ignoring Plaintiff's desperate pleas for help regarding the dangerous assistant and refusing to observe the situation despite promises to do so;

e. Repeatedly pressuring Plaintiff to retire despite her clear desire to continue teaching;

f. Locking Plaintiff out of school systems;

g. Falsely claiming Plaintiff had voluntarily resigned when she had done no such thing;

h. Terminating Plaintiff after 33 years of exemplary service rather than providing the accommodations required by law.

147. Defendants' conduct was intentional and reckless, undertaken with knowledge of Plaintiff's disabilities and vulnerabilities.

148. Defendants' conduct was so extreme and outrageous as to exceed all bounds of decency and was utterly intolerable in a civilized community.

149. Defendants knew or should have known that their conduct would cause severe emotional

21

distress to Plaintiff.

150.    As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff suffered and continues to suffer severe emotional distress, including anxiety, depression, humiliation, loss of self-esteem, and sleep disturbances.

## COUNT IX

### Breach of Contract

### (Against Defendant The Park School)

151.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 101 as if fully set forth herein.

152.    Plaintiff and Defendant The Park School entered into a valid and binding employment contract for the 2022-2023 school year.

153.    Plaintiff signed and returned the contract on March 4, 2022.

154.    Plaintiff performed all conditions precedent and substantially performed her obligations under the contract by reporting to work, teaching her classes, and carrying out her duties despite the School's failure to provide promised accommodations.

155.    Defendant The Park School breached the contract by:

    a. Failing to provide the working conditions and accommodations agreed upon;

    b. Terminating Plaintiff's employment without cause;

    c. Failing to follow proper procedures for termination;

    d. Falsely characterizing Plaintiff's termination as a "voluntary resignation" when no resignation occurred.

156.    As a direct and proximate result of Defendant The Park School's breach, Plaintiff has

suffered damages including lost wages, lost future wages, benefits for the remainder of the contract term and beyond, and other consequential damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Janice Allen-Brooks respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against Defendants on all counts;

B. Award Plaintiff compensatory damages, including but not limited to:

- Back pay and front pay;

- Lost wages and benefits;

- Lost future earning capacity;

- Retirement benefits;

- Emotional distress damages;

- Consequential damages;

C. Award Plaintiff punitive damages where permitted by law to punish Defendants' willful, wanton, and reckless conduct and to deter similar conduct in the future;

D. Award Plaintiff reasonable attorneys' fees, costs, and expenses as provided by M.G.L.

c. 151B and the ADA;

E. Award Plaintiff prejudgment and post-judgment interest as provided by law;

F. Order Defendants to return all personal property belonging to Plaintiff; and

G. Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,
Janice Allen-Brooks,
By her attorney,

23

Dated: October 15, 2025

/s/ Colin D. Creager
Colin D. Creager, BBO# 697526
McKenzie & Associates, P.C.
183 State Street, Suite 6
Boston, MA 02109
ccreager@mckenzielawpc.com
617-723-0400

## VERIFICATION OF COMPLAINT

I, the undersigned, hereby certify that I have read and reviewed the entire complaint and that the within Complaint is true and correct and omits no material facts.

Janice Allen-Brooks

10/15/2025
Date

24